<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>           Plaintiff,<br><br>   v.<br><br>MARIO E. RIVERO,<br><br>           Defendant. | Civ. A. No. 3:22-cv-1360 (GC) (DEA)<br><br>**OPINION** |

<u>**CASTNER, District Judge**</u>

This matter comes before the Court upon Defendant Mario E. Rivero's ("Rivero") Motion to Dismiss. (*See* Mot., ECF No. 6.) The Securities and Exchange Commission (the "SEC") opposed (*see* Opp'n, ECF No. 10), and Rivero replied (*see* Reply, ECF No. 11). The Court has reviewed the parties' submissions, and reaches its decision without oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78 and Local Civil Rule 78.1. For the reasons stated herein, and for other good cause shown, Rivero's Motion is **DENIED**.

## I.    <u>BACKGROUND</u>

### A.    **Factual Background**[1]

This matter arises from an alleged scheme perpetrated by Rivero to defraud his clients, some of whom were elderly or disabled, while he was employed as a financial advisor by a large

---

[1] When evaluating a motion to dismiss, "all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them." *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) (quoting *Schrob v. Catterson*, 948 F.2d 1402, 1408 (3d Cir. 1991)).

institutional broker-dealer registered with the SEC. (*See* Compl. ¶¶ 1-2, 4, ECF No. 1.) Until he was barred by the Financial Industry Regulatory Authority from associating with registered firms in June 2021, Rivero held series 6, 7, 63, and 68 licenses. (*Id.* ¶ 14.)

From July 2018 through November 2020 (the "Relevant Period"), Rivero is alleged to have misappropriated a minimum of $680,000.00 from at least five of his clients, by convincing them to transfer funds held in accounts with his employer to their respective personal accounts, and then to "entities that Rivero was secretly associated with." (*Id.* ¶¶ 2, 4.) While Rivero represented that these transfers were intended to enable him to make investments on behalf of his clients and customers, "[i]n reality, Rivero siphoned hundreds of thousands of dollars from the entities that received the investor funds for his own benefit." (*Id.* ¶ 5.) Moreover, he failed to disclose to his clients that "he would personally benefit from the fund transfers." (*Id.*)

*The Business Entities*

There are five relevant business entities at play in the alleged scheme: two large-scale institutional registered broker-dealers and financial advisers, and three of Rivero's secret companies (hereinafter collectively referenced as the "Rivero Affiliated Companies"). (*Id.* ¶¶ 2-3, 15-17.) The first financial institution ("Financial Institution A"), through which Rivero was registered as a representative and investment advisor from May 2010 through September 2020, employed Rivero as a professional to manage "investment accounts for the owners of advisory accounts ('clients') and the owners of brokerage accounts ('customers')." (*Id.* ¶ 2.) The second financial institution ("Financial Institution B") similarly registered and employed him from the period of September 2020 through June 2021. (*See id.* ¶¶ 3, 14.)

In addition to the legitimately operational institutions through which Rivero derived his registration, he is connected with three secret companies, all nominally owned by a relative or

close friend, and all alleged to have "received some of the misappropriated investor funds and distributed some of those funds to Rivero." (*Id.* ¶¶ 4, 15-17.) The first is a New Jersey corporation ("Company A") that states its purpose as "investment advice," and is owned by a relative. (*Id.* ¶ 15.) The next is a similarly situated New Jersey corporation ("Company B"), and the last is a Florida corporation, nominally owned by a close friend ("Company C"). (*Id.* ¶¶ 16-17.)

*The Investors*

Among possible others, Rivero managed accounts for five individuals at Financial Institution A that he is specifically alleged to have defrauded in the execution of his scheme: "Investors A, B, C, D, and E" (collectively, the "Investors"). (*See id.* ¶¶ 19, 21, 26.)

"Investor A" held at least one advisory account and one brokerage account at Financial Institution A, which were managed by Rivero. (*See id.* ¶ 20.) As Investor A's registered broker, Rivero had access to Investor A's private financial information, including personal identifying information, account numbers, and cash positions. (*See id.* ¶ 22.) Rivero also had access to private financial information related to Investor A's advisory account(s), and provided investment advice concerning the same. (*See id.* ¶ 23.) Investor A is eighty-six (86) years old, and resides with her two siblings, Investors B and C. (*See id.* ¶ 37.)

"Investor B" is a sibling of Investor A and was a joint holder on Investor A's advisory account (the "Joint Account"). (*Id.* ¶ 20.) As investment advisor to the account jointly held by Investor B, Rivero had access to private financial information related to the advisory account, and provided investment advice concerning the same. (*See id.* ¶ 23.) Investor B is ninety-three (93) years old, "suffers from a memory impairment," and resides with Investors A and C. (*See id.* ¶ 37.)

"Investor C," a sibling of Investors A and B, held a separate brokerage account managed by Rivero at Financial Institution A. (*Id.* ¶ 20.) As Investor C's registered broker, Rivero had

access to Investor C's private financial information, including personal identifying information, account numbers, and cash positions. (*See id.* ¶ 22.) Investor C is eighty-three (83) years old, and resides with Investors B and C. (*Id.* ¶ 37.)

Investor D held at least one advisory account and one brokerage account at Financial Institution A, which were managed by Rivero. (*Id.* ¶ 20.) As Investor D's registered broker, Rivero had access to Investor D's private financial information, including personal identifying information, account numbers, and cash positions. (*See id.* ¶ 22.) Rivero also had access to private financial information related to Investor D's advisory account(s), and provided investment advice concerning the same. (*See id.* ¶ 23.)

Investor E held at least one advisory account and one brokerage account at Financial Institution A, which were managed by Rivero. (*Id.* ¶ 20.) As Investor E's registered broker, Rivero had access to Investor E's private financial information, including personal identifying information, account numbers, and cash positions. (*See id.* ¶ 22.) Rivero also had access to private financial information related to Investor E's advisory account(s), and provided investment advice concerning the same. (*See id.* ¶ 23.)

*The Scheme*

First, Rivero convinced the Investors "to transfer funds out of their advisory and/or brokerage accounts at Financial Institution A to their personal bank accounts, which were frequently held at a bank affiliated with Financial Institution A ('Bank A')[,]" under the pretext that this would enable Rivero to beneficially invest the funds on the Investors' behalf, *e.g.*, claiming to some that he would invest the funds in the stock market (*Id.* ¶ 28.) In "a significant number of instances," Rivero effectuated the sale of securities in the individual investor's brokerage account, so that cash was available to transfer to the investor's bank account – but failed

to disclose that his direction was in furtherance of his scheme, instead of in "execut[ion of] a legitimate investment strategy." (*See id.* ¶ 29.)

When the sales settled and the cash in the brokerage account became accessible, Rivero convinced the Investors "to obtain cashier's checks from Bank A, or in the case of Investor D, a different bank," payable to one of his secret business entities, the Rivero Affiliated Companies. (*Id.* ¶¶ 30-31.) "In some instances, Rivero accompanied [the Investor] to a branch office of Bank A to obtain these cashier's checks and spoke to the cashier on the [Investor's] behalf." (*Id.* ¶ 30.) He represented that the cash "payments to the Rivero Affiliated Companies were intended to facilitate legitimate investments[,]" and failed to disclose his relation to these business entities, as well as that "they were not legitimate investment vehicles." (*Id.* ¶ 32.) Moreover, Rivero neglected to inform his clients and customers that "a substantial portion of [the Investors'] investment funds would ultimately flow to him[,]" let alone disclose to the Investors that he had received such a sum upon his actual collection of it. (*Id.* ¶ 35.)

Finally, Rivero effectuated the transfer of funds "from bank accounts held by the Rivero Affiliated Companies to his own accounts, including his personal brokerage account, PayPal accounts in his name, and bank accounts that he controlled." (*Id.* ¶ 34.)  During the Relevant Period, by "repeat[ing] this pattern of fund transfers more than a dozen times," "Rivero caused Investors A, B, C, D, and E, to collectively transfer at least $680,000[.00] to the Rivero Affiliated Entities in this manner." (*Id.* ¶¶ 33, 35.) None of the Investors would have agreed to participate had they known Rivero's true purpose. (*Id.* ¶ 36.)

*The Elderly Investors, Investors A, B, and C*

By way of illustration, Rivero is alleged to have ingratiated himself in the lives of three elderly siblings, Investors A, B, and C, and to have cultivated "a close personal relationship" with

them, including spending some holidays together, to enable him to perpetuate his scheme to defraud them. (*Id.* ¶ 37.) On September 10, 2019, Rivero is alleged to have sold mutual funds from the Joint Account belonging to Investors A and B, totaling $27,000.00. (*Id.* ¶ 38.) Two days later, on September 12, 2019, Rivero effectuated the transfer of $27,008.00 from the Joint Account to another joint account they owned at Bank A. (*Id.* ¶ 39.)

Next, on September 18, 2019, Rivero convinced Investor A to acquire a cashier's check from Bank A payable to his affiliated Company A, by stating that "the purpose of the check was so that he could invest the funds in the stock market on her and Investor B's behalf." (*Id.*) The cashier's check was deposited in the bank account held by Company A on September 19, 2019. (*Id.* ¶ 40.)

In the following days, Company A "made numerous payments that benefited Rivero including, but not limited to, $13,900[.00] in transfers to a checking account jointly owned by Rivero and one of his relatives, made between September 20, 2019, and September 24, 2019," and including a $2,000.00 cash withdrawal on September 23, 2019. (*Id.*) Finally, Rivero doctored a financial statement for a brokerage account which does not exist, purportedly belonging to Investors A and B. (*Id.* ¶ 41.) He provided it to them as evidence "reflecting that he had invested the funds in the stock market on their behalf," and did not disclose his significant personal benefit nor any other part of his scheme. (*Id.* ¶¶ 41-42.)

B.      **Procedural History[2]**

The SEC filed its Complaint on March 14, 2022, alleging violations of sections 17(a)(1)

and 17(a)(2) of the Securities Exchange Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a)(1)

& (2) (*see* Compl. ¶¶ 43-45); that Rivero had violated Section 10(b) of the Securities Exchange

Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and its concordant regulation, Regulation

10b-5, 17 C.F.R. § 240.10b-5 (*see id.* ¶¶ 46-48); and violations of sections 206(1) and 206(2) of

the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. § 80b-6(1) & (2) (*see id.*

¶¶ 49-52).  Rivero filed the instant motion on June 6, 2022, arguing that dismissal for failure to

state a claim is appropriate because the SEC has failed to adequately plead its fraud claims with

specificity pursuant to Rule 9(b).  (*See generally* Rivero's Mot., ECF No. 6.)  The Court permitted

the SEC a brief extension on time to oppose for lack of proper service, also with Rivero's consent.

(*See* Aug. 3, 2022 Letter Order, ECF No. 8.)  On August 16, 2022, the SEC opposed, (*see* Opp'n,

ECF No. 10), and on August 18, 2022, Rivero replied (*see* Reply, ECF No. 11).  On October 4,

---

[2] Raising the issue for the first time in Reply, Rivero alerts the Court to the existence of a concurrent criminal proceeding.  (*See* Rivero's Reply Br. 5, ECF No. 11.)  He submits that disposition of this matter is therefore premature, as he has yet to make "any kind of plea in the concurrent criminal case although at the present time, one is expected," and because he "is accepting responsibility in the criminal matter and will continue to cooperate with the U.S. Attorney's Office." (*Id.* at 4-5.)  Though Rivero asserts in passing that these considerations provide "more reasons to stay this matter," he has not elected to move to stay this civil enforcement action pending the outcome of the criminal action.  Indeed, "[f]ederal courts have deferred civil proceedings pending the completion of parallel criminal prosecutions when the interests of justice seemed to require such action, sometimes at the request of the prosecution, sometimes at the request of the defense." *United States v. Kordel*, 397 U.S. 1, 12 n.27 (1970) (collecting cases) (internal citations omitted); *see also SEC v. Desai*, 672 F. App'x 201, 205 (3d Cir. 2016) (finding that the district court did not abuse its discretion by staying civil action pending resolution of the criminal matter "given the substantial overlap between the subject matter of the two proceedings").  Absent a motion by either party formally indicating the desire to stay this action, however, the actions will proceed concurrently.

2022, the matter was transferred to the Undersigned for all further proceedings.  (*See* Oct. 4, 2022

Text Order, ECF No. 12.)

## II.     **LEGAL STANDARD**

Under the Federal Rules, a complaint must include "a short and plain statement of the claim

showing that the pleader is entitled to relief" Fed. R. Civ. P. 8(a)(2), "in order to 'give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests[,]'" *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)

*abrogated by Twombly*, 550 U.S. 544).  "To survive a motion to dismiss, a complaint must contain

sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

"[W]hen presented with a motion to dismiss for failure to state a claim, district courts

should conduct a two-part analysis."  *Fowley v. UMPC Shadyside*, 578 F.3d 203, 210 (3d Cir.

2009).  The district court "must accept all of the complaint's well-pleaded facts as true, but may

disregard any legal conclusions." *Id.* at 210-11 (citing *Iqbal*, 556 U.S. at 678).  The district court

"must then determine whether the facts alleged in the complaint are sufficient to show that the

plaintiff has a 'plausible claim for relief[,]'" *id.* at 211 (quoting *Iqbal*, 556 U.S. at 679), in other

words, whether "[a] complaint has [] 'show[n]' such an entitlement with its facts[,]" *id.* (citing

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234-35 (3d Cir. 2008)).

Generally, plaintiffs advancing fraud claims "must also plead their claims with plausibility

and particularity under [Rules] 8 and 9(b)[.]" *Univ. Health Servs., Inc. v. United States*, 579 U.S.

176, 195 n.6 (2016).  The Federal Rules outline the elevated standard, namely, that "[i]n alleging

fraud or mistake, a party must state with particularity the circumstances constituting fraud or

mistake," though "[m]alice, intent, knowledge, and other conditions of a person's mind may be

alleged generally."[3]  Fed. R. Civ. P. 9(b).  "Rule 9(b) requires that 'in all averments of fraud or

mistake, the circumstances constituting fraud or mistake shall be stated with particularity,'" and

this "particularity requirement has been rigorously applied in securities fraud cases." *In re

Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997) (quoting *Suna v. Bailey

Corp.*, 107 F.3d 64, 68 (1st Cir. 1997)).  "In order to satisfy Rule 9(b), a complaint must provide

all of the essential factual background that would accompany the first paragraph of any newspaper

story—that is, the who, what, when, where and how of the events at issue." *United States v.

Eastwick Coll.*, 657 F. App'x 89, 93 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec.

Litig.*, 311 F.3d 198, 217 (3d Cir 2002) (internal punctuation omitted); *see Inst. Invs. Grp. v. Avaya,

Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (quoting *Cent. Laborers' Pension Fund v. Integrated Elec.

Servs., Inc.*, 497 F.3d 546, 550 (5th Cir. 2007)) ("[T]his Court's relatively strict interpretation of

Rule 9(b), [] requires a plaintiff to specify the statements contended to be fraudulent, identify the

---

[3] The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes two additional requirements: first, that private plaintiffs identify each alleged misleading statement with particularity, and second, that private plaintiffs plead scienter with particularity. *See Avaya, Inc.*, 564 F.3d at 252-53.  (comparing pleading requirements under 9(b) and the PSLRA). The PSLRA, enacted "[a]s a check against abusive litigation by private parties" does not govern the instant matter. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 & 319 (2007), *superseded by statute*, PSLRA, Pub. L. No. 104-67, 109 Stat. 737) (collecting cases).  "In a civil penalty action, the Government is not only a different kind of plaintiff, it seeks a different kind of relief." *Gabelli v. SEC*, 568 U.S. 442, 451 (2013).  "Unlike the private party who has no reason to suspect fraud, the SEC's very purpose is to root it out, and it has many legal tools at hand to aid in that pursuit." *Id.*  Indeed, a private cause of action for violations of Section 17(a) of the Securities Act does not exist.  *See SEC v. Pasternak*, 561 F. Supp. 2d 459, 478 n.6 (D.N.J. 2008) (highlighting the Supreme Court of the United States' holding in *Touche Ross & Co. v. Redington*, 442 U.S. 560, 579 (1979) that Section 17(a) cannot sustain a private right of action because the provision "neither confers rights on private parties nor proscribes any conduct as unlawful").  Moreover, private rights under the Investment Advisers Act are very limited.  *See Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 502 n.37 (2013) ("There exists only 'a limited private remedy under the [Advisers Act] to void an investment advisers contract' made in violation of the Act.").  In short, government enforcement actions are not subject to the PSLRA, and therefore the SEC is not required to meet the additional pleading requirements set out by the remedial statute. *See SEC v. Kearns*, 691 F. Supp. 2d 601, 609 n.5 (D.N.J. 2010) (citing *Avaya, Inc.*, 564 F.3d at 253).

speaker, state when and where the statements were made, and explain why the statements were fraudulent.").

## III.  <u>DISCUSSION</u>

Rivero moves to dismiss the SEC's complaint for failure to state a claim, arguing that the SEC has failed to plead with sufficient specificity, in order to meet the heightened standard under Rule 9(b).  (*See* Rivero's Moving Br. 6-7, ECF No. 6-1.)  Rivero asserts that to clear this hurdle, the SEC "must (1) detail the statements that [the SEC] contends are fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent."  (*Id.* at 7 (citing *USI Int'l, Inc. v. Festo Didactic, Inc.*, No. 15-8541, 2018 WL 2973380, at *4 (June 12, 2018)).)  He submits that the SEC's Complaint does not identify any statements in relation to his alleged scheme, including statements to establish scienter, or any allegations to establish fraud against Investors D and E.  (*Id.* at 5-6.)  Specifically, he argues that the SEC "fails to disclose the dates when the allegedly fraudulent statements were made, to whom they were made, what in the statements was fraudulent and how [the Investors] relied on such fraudulent statements[,]" which, Rivero argues, renders the Complaint deficient under Rule 9(b). (*Id.* at 6-7.)

The SEC responds that it has provided sufficiently specific details about Rivero's statements, to wit: that "Rivero told [the Investors] between July [2018] and November 2020 that the purpose of the fund transfers was to effectuate investments for the investors," (*see* SEC's Opp'n Br. 5, ECF No. 10 (citing Compl. ¶¶ 5, 28, 32)), that "Rivero told the [I]nvestors that the funds would be transferred to the Rivero-affiliated entities to facilitate investments for the [I]nvestors, and in some cases [Rivero] specified that the funds would be invested in stocks (*id.* at 7 (citing *id.* ¶¶ 5, 28, 32)).  Though it may not state the exact date and time the alleged statements were made,

the SEC argues that its pleading conforms to the more nebulous standard available to enterprising plaintiffs, which permits a plaintiff's use of "'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" (*Id.* at 5-6 (quoting *SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 715 (D.N.J. 2005)).) Emphasizing the circumstances peculiar to this case, the SEC contends that in context, the Complaint provides sufficient particularity to state a fraud claim. (*Id.* at 6 (highlighting Rivero's pre-existing relationship as a broker and financial advisor to the Investors, as well as his representations that the funds would be used beneficially on the Investors' behalf).) Similarly, the SEC urges that consideration of the scheme in context demonstrates adequate scienter. (*Id.* at 7-8.)

In Reply, Rivero advances substantially similar arguments to those made in support of his Motion, though he elaborates his reasoning concerning adequacy per Rule 9(b) and scienter. (*See* Rivero's Reply Br. 2-4, ECF No. 11.) Regarding adequacy of the pleading under Rule 9(b), Rivero asserts that the SEC has failed to state how he availed himself of "the mails and other instrumentalities of interstate commerce." (*Id.* at 3.) Toward adequacy of the SEC's statement of scienter, Rivero underscores that the SEC's pleading fails to state exactly how Rivero convinced the Investors to transfer their funds, when he made these statements, and to whom he made them specifically. (*Id.* at 4-5.)

"Each of these statutes—the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*[,] the [] Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* . . . and the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.*—serves the 'fundamental purpose' of 'substitut[ing] a philosophy of full disclosure for the philosophy of *caveat emptor* and thus . . . achiev[ing] a high standard of business ethics in the securities industry." *Kokesh v. SEC*, 581 U.S. 455, 458 n. 1 (2017) (quoting *SEC v. Cap. Gains Rsch. Bureau*, 375 U.S. 180, 186 (1963)). Cognizant of these policy objectives, the

Court considers the sufficiency of the three claims advanced in the Complaint, as well as the sufficiency of the factual allegations stated therein.

### A.    Securities Act of 1933 and Exchange Act of 1934

The SEC's claim stating violations of subsections (1) and (2) of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(1) & (2) (*see* Compl. ¶¶ 43-45), and its claim that Rivero has violated Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), as supplemented by Regulation 10b-5, 17 C.F.R. § 240.10b-5 (*see* Compl. ¶¶ 46-48), stem from the central factual assertion that "Rivero used his position as a broker and investment adviser to misappropriate at least $680,000[.00] from his clients and customers" (*see* Compl. ¶ 26).

"The basic purpose of the 1934 and 1933 regulatory statutes is 'to insure honest securities markets and thereby promote investor confidence.'" *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 390 (2014) (citing *United States v. O'Hagan*, 521 U.S. 642, 643-44 (1997)).  To that end, Sections 17(a)(1) and (2) of the Securities Act proscribe, respectively, those engaged in the offer or sale of securities from using interstate commerce from, *see* 15 U.S.C. § 77q(a), "employ[ing] any device, scheme or artifice to defraud," *id.* § (a)(1), and from "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," *id.* § (a)(2).  The similarly motivated Section 10(b) of the Exchange Act prohibits the use of any manipulative or deceptive device in connection with the purchase or sale of securities, and Regulation 10(b)(5) iterates nearly identical elements to those stated in Section 17(a) of the Securities Act.[4]  *Compare* 15 U.S.C. § 78j(b) *with* 17 C.F.R.

---

[4] Though the laws are nearly identical, the SEC asserts a claim under the first two provisions of the Securities Act (*compare* Compl. ¶¶ 43-45 (asserting violations of Sections 17(a)(1) & (2) only)), while it appears that the SEC's claim encompasses all three of the prohibited actions under

§ 240.10b-5 (prohibiting actions proscribed by Sections 17(a)(1) & (2) of the Securities Act, the third element restraining use of the mail and any national securities exchange "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person").

The standards for stating a claim under Section 17(a) of the Securities Act and pursuant to Section 10(b) of the Exchange Act are "essentially the same." *SEC v. Desai*, 145 F. Supp. 3d 329, 335 (D.N.J. 2015), *aff'd*, 672 F. App'x 201, 205 (3d Cir. 2016) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996)) (explaining that the statutes and rule forbid "fraudulent conduct in connection with the purchase and/or sale of securities, and the elements required to prove violations are essentially the same"). There are a few notable differences, however. "Section 17(a) of the Securities Act prohibits fraudulent conduct in the <u>offer or sale</u> of securities, while Section 10(b) of the Exchange Act and [Regulation] 10b-5 thereunder prohibit fraudulent conduct in connection with the <u>purchase or sale</u> of securities." *SEC v. Dubovoy* [(hereinafter distinguished as "*Dubovoy I*")], No. 15-06076, 2019 WL 6271602, at *4 (D.N.J. Nov. 25, 2019) (citing 15 U.S.C. §§ 77q(a) & 78j(b); 17 C.F.R. § 240.10b-5) (emphasis in original). Furthermore, a showing of scienter is not required to sustain a claim under Section 17's subsections (a)(2) and (a)(3) of the Securities Act. *See Aaron v. SEC*, 446 U.S. 680, 697 (1980) ("[I]n sum, [] the language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3).").

To survive Rivero's 12(b)(6) motion on its claim under Section 10(b) of the Exchange Act and Regulation 10b-5, the SEC must adequately allege that Rivero (1) "made a material representation or material omission as to which [he] had a duty to speak, or used a fraudulent

---

the Exchange Act's relevant regulation (*with id.* ¶¶ 46-48 (specifically alleging violations of Regulation 10b-5(a), (b) & (c))).

device; (2) with scienter; (3) in connection with the purchase or sale of securities." *See SEC v. Chiase*, No. 10-5110, 2011 WL 6176209, at *4 (D.N.J. Dec. 12, 2011) (collecting cases); *see also Dubovoy I*, 2019 WL 6271602, at *4 (citing *Desai*, 145 F. Supp. 3d at 335). "In other words, to provide a violation of § 10(b) and Rule 10b-5, the plaintiff must establish that the defendant, acting with knowledge or recklessness, made a misrepresentation or omission of a material fact on which the plaintiff reasonably relied and which resulted in damage." *Pasternak*, 561 F. Supp. 2d at 498-99 (quoting *In re Tyson Foods, Inc.*, 155 F. App'x 53, 56 (3d Cir. 2005)).

To state a claim under its sister provision, subsections 17(a)(1) and (2) "require[] a showing of the same elements except that the statement may be made in connection with the offer or sale of a security, and no showing of scienter is required for the SEC to obtain an injunction under subsection[] (a)(2)[.]" *Chiase*, 2011 WL 6176209, at *4  (citing *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) & *SEC v. Saltzman*, 127 F. Supp. 2d 660, 665 (E.D. Pa. 2000)).

To establish the first element of the claims, a plaintiff must show that the defendant made an affirmative material misrepresentation, or in the alternative, bears responsibility for a material omission.  "Material information is information that would be important to a reasonable investor in making his or her investment decision." *United States v. Schiff*, 602 F.3d 152, 171 (3d Cir. 2010) (quoting *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000)).  In asserting a material omission, the SEC must also demonstrate the existence of a duty to disclose. *See Pasternak*, 561 F. Supp. 2d at 499 (explicitly stating the same); *see also SEC v. Zandford*, 535 U.S. 813, 823 (2002) (explaining that "any distinction between omissions and misrepresentations is illusory in the context of a broker who has a fiduciary duty to her clients"). "While it is true that even non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information, [*Oran*, 226 F.3d at 285], there is a

duty to disclose any material facts that are necessary to make disclosed material statements, whether mandatory or volunteered, not misleading[,]" *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 641 (3d Cir. 1989)." *SEC v. Kearns*, 691 F. Supp. 2d 601, 616 (D.N.J. 2010). The "test for materiality is whether 'there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information available." *Chiase*, 2011 WL 6176209, at *4 (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F. 2d 186, 200 (3d Cir. 1990)).

It is readily apparent that the Complaint alleges that Rivero made a material misrepresentation to the Investors when he induced them to transfer their funds from Financial Institution A. (*See* Compl. ¶ 28 (affirmatively alleging that Rivero made false statements to induce his clients and customers to transfer funds from their accounts at Financial Institution A).) It is also clear that by failing to disclose that the Investors' funds would be diverted into Rivero's personal accounts shortly after being deposited in bank accounts held by the Rivero Affiliated Companies, Rivero allegedly made a "material omission as to which he had a duty to speak." *See Chiase*, 2011 WL 6176209, at *4 (collecting cases); (*see* Compl. ¶¶ 32, 35.) A reasonable investor would consider this behavior to be, at best, a culpable reckless disregard for the needs and best interests of the Investors entrusted to his care. *See Chiase*, 2011 WL 6176209, at *4 (quoting *Hoxworth*, 903 F. 2d at 200).

The facts in *Chiase* are directly analogous to the case at bar. In its materiality analysis, the Court paraphrased the following:

> As outlined in the facts above, [Chiase], while operating through CGC, made numerous misrepresentations to investors in connection with the offer and sale of securities: he received funds with the pretense that he would invest those funds and then turned around and misappropriated them for his own use. On some occasions, he even furnished his defrauded clients with falsified records of their

> nonexistent investments. These statements and omissions were
> material as a matter of law because any investor would obviously
> want to know that his financial adviser was misappropriating the
> investor's funds.

*Id.* (citing *Pasternak*, 561 F. Supp. 2d at 498); *see also SEC v. Gu*, No. 21-17578, 2022 WL 2753478, at *3 (D.N.J. July 13, 2022) (finding the SEC's complaint met the heightened 9(b) standard "by alleging [the defendant and accomplice] (who), engaged in a wash trading scheme (what) from February through April 2021 (when), by using brokerage accounts at broker dealers that they misled (where and how) to obtain rebates offered by securities exchanges for certain types of trades (why)").

So is the case here. The Complaint alleges that Rivero (who) (*see* Compl. ¶ 14), engaged in a scheme to defraud his clients and customers (what and whom) (*see id.* ¶ 27), with whom he engaged as a function of his employment at Financial Institution A (where) (*see id.* ¶¶ 2, 4), during the Relevant Period, *i.e.*, from July 2018 and November 2020 (when) (*id.* ¶ 4), by convincing them to transfer funds from their brokerage and investment accounts to their personal bank accounts, and then deposit the funds to bank accounts held by his affiliated secret companies, substantial portions of which he transferred to his personal accounts (how, and why) (*see id.* ¶¶ 28-36). Here, Rivero's alleged failure to disclose his Rivero Associated Companies, in addition to his failure to disclose that the bank accounts in which the Investors were depositing their funds were not legitimate investment vehicles (*id.* ¶ 32), as well as that "a substantial portion of [the Investors'] investment funds would ultimately flow to him" (*id.* ¶ 35), constituted "disclosure[s that] would have been viewed by a reasonable investor as having significantly altered the total mix of information available[.]" *Chiase*, 2011 WL 6176209, at *4. In other words, the SEC has clearly alleged that Rivero made material omissions to the detriment of his clients and customers.

Though not required to sustain all of the claims, the SEC has adequately demonstrated that Rivero acted with scienter. "Scienter is 'a mental state embracing intent to deceive, manipulate or defraud,'" and can be established by showing recklessness. *SEC v. Infinity Grp., Co.*, 212 F.3d 180, 192 (3d Cir. 2000) (internal citations omitted). "To establish scienter, the [SEC] may 'either (1) identify circumstances indicating conscious or reckless behavior by [the] defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud.'" *SEC v. RRBB Asset Mgmt.*, No. 20-12523, 2021 WL 3047081, at *2 (D.N.J. July 20, 2021) (quoting *In re Burlington Coat Factory*, 114 F.3d at 1422). Scienter "can be inferred from circumstantial evidence." *Dubovoy I*, 2019 WL 6271602, at *4 (citing *Valicenti Advisory Servs. v. SEC*, 198 F.3d 62, 65 (2d Cir. 1999)) (). The SEC need not allege scienter with particularity, but its 'factual allegations [must] support a plausible inference of scienter." *SEC v. Dubovoy* [("*Dubovoy II*")], No. 15-5076, 2016 WL 5745099, at *5 (D.N.J. Sept. 29, 2016) (citing *SEC v McGee*, 895 F. Supp. 2d 683 (E.D. Pa. 2012)).

Considering the context of the alleged scheme, the SEC pleads scienter through both of the available avenues. *See RRBB Asset Mgmt.*, WL 3047081, at *2 (quoting *In re Burlington Coat Factory*, 114 F.3d at 1422). The scheme alleged provides details of "circumstances indicating conscious or reckless behavior" by Rivero. (*See* Compl. ¶¶ 28-36.) Even if the Court accepts as true his argument in briefing (which it is under no obligation to do), that his "position is that he had all but good intentions to invest the funds and make money because the [I]nvestors wanted to make more than they were making with their banks," (*see* Rivero's Reply Br. 4), no reasonable reading of the Complaint permits a conclusion other than that Rivero knew or recklessly disregarded that his omissions were false or misleading to his clients and customers in furtherance of his altruistic pursuits. *See Burlington Coat Factory*, 114 F.3d at 1422 (citing *Suna*, 107 F.3d at

68). As for motive and opportunity, money is the motive, and the opportunity was the professional status conferred upon him. *See RRBB Asset Mgmt.*, 2021 WL 3047081, at *2 (quoting *In re Burlington Coat Factory*, 114 F.3d at 1422).

Considering the third element, the SEC has alleged that the scheme was connected to the purchase or sale of securities. (*See* Compl. ¶ 29 (detailing that "[i]n a significant number of instances, Rivero directed the sale of securities in [the Investors'] brokerage account prior to the transfer of funds from the investment account").

Finally, to Rivero's argument that the SEC has failed to plead his manner of use of "the mails and other instrumentalities of interstate commerce[,]" (Rivero's Reply Br. 3), the SEC avers that Rivero has transferred funds from New Jersey bank accounts to Company C, which is located in Florida, and then back to his accounts. (*See* Compl. ¶¶ 13, 17, 34.) Even if Company C was not in play, the Court finds the Complaint adequately pled such that it will permit the SEC to investigate whether Rivero used interstate commerce to effectuate his scheme, *i.e.*, whether he communicated in its course via telephone, email, or other relevant communications. (*Id.* ¶¶ 44, 47 (claiming that Rivero employed the instruments of interstate commerce in furtherance of his fraudulent scheme).)

### B.     Advisers Act of 1940

The SEC states a third claim under sections 206(1) and 206(2) of the Advisers Act, *see* 15 U.S.C. § 80b-6(1) & (2), which encompasses fraudulent action against the Investors' respective advisory accounts. (*See* Compl. ¶¶ 49-52.) The violations alleged in the SEC's Complaint are of the same nature as the subject matter contemplated in, and covered by, the Advisers Act. *See generally* 15 U.S.C. § 80b-1, *et seq.* "Congress adopted [the Investment Advisers Act of 1940] because of its concern with the potential for abuse inherent in the structure of investment

companies." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 339 (2010) (quoting *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984)). The statute "reflects a congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship', as well as a congressional intent to eliminate, or at least expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested." *Cap. Gains*, 375 U.S. at 191-92. "The [SEC] is authorized to bring enforcement actions against investment advisers who violate the Act, or individuals who aid and abet such violations." *Gabelli v. SEC*, 568 U.S. 442, 445 (2013) (quoting 15 U.S.C. § 80b-9(d)).

Under the Act, "'it is unlawful for an investment adviser 'to employ any device, scheme, or artifice to defraud any client or prospective client,' or 'to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.'" *Gabelli* 568 U.S., at 445 (2013) (quoting 15 U.S.C. § 80b-6(1) & (2)). "Sections 206(1) and 206(2) prohibit fraudulent conduct by investment advisers and impose a fiduciary duty on investment advisers." *Chiase*, 2011 WL 6176209, at *5. "That duty requires an adviser to act in good faith, to disclose fully and fairly all material facts to its clients, and to employ reasonable care to avoid misleading its clients." *Id.* (quoting *Cap. Gains*, 375 U.S. at 194-95). "Establishing a violation of Section 206(1) requires a demonstration of scienter, but such a showing is not required to prove violations of Section 206(2)." *Desai*, 145 F. Supp. 3d at 336 (citing *Steadman v. SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979)).

Critically, the Court's findings that the SEC has adequately pled causes of action under the Securities Act and Exchange Act in the previous section are determinative. "Facts showing a violation of Section 17(a) or 10(b) by an investment adviser will also support a showing of a Section 206 violation." *Id.* (quoting *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 383 (S.D.N.Y.

2007)).  The SEC has sufficiently alleged that Rivero breached his fiduciary duty to his customers and clients by making affirmative misrepresentations and material omissions.  (*See, e.g.*, Compl. ¶¶ 32 ("Rivero falsely represented to the affected clients and customers that the payments to the Rivero Affiliated Companies were intended to facilitate legitimate investments") & 35 (providing material omissions).)  By failing to disclose, Rivero breached his fiduciary duty to his clients and customers.  *Chiase*, 2011 WL 6176209, at *5.  As stated, the element of scienter is sufficiently demonstrated to show at least a reckless disregard for the interests of the Investors within his care. (*See* Compl. ¶¶ 28-32.)

The Court finds Rivero's arguments unpersuasive, and finds that the Complaint is sufficiently particular to meet the heightened pleading standard under Rule 9(b).

## IV.  <u>CONCLUSION</u>

For the reasons iterated herein, and other good cause shown, Rivero's Motion to Dismiss is denied.  An appropriate Order follows.

February 27, 2023

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE